[Civ. No. 14606. Second Dist., Div. Three. Apr. 25, 1946.]

FRANK C. MORTIMER, as Building and Loan Commissioner, etc., Appellant, v. R. R. LOYNES et al., Respondents.

Robert W. Kenny, Attorney General, and Joseph A. Ball for Appellant.

Clock, Waestman & Clock and Swaffield, Swaffield & Madden and Roland G. Swaffield for Respondents.

FOX, J. pro tem.—This is an appeal by the plaintiff from a judgment in favor of the defendants.

The action, generally speaking, is prosecuted by the plaintiff, Building and Loan Commissioner, as liquidator of the Mutual Building & Loan Association of Long Beach, for the purpose of recovering $7,398.59, alleged to have been wrongfully withheld by the defendants from the association in connection with the sale of a furnished apartment house that belonged to the association.

In view of the questions that must be considered it is necessary to set forth the allegations of the amended·complaint in considerable detail. It is alleged that defendant Loynes was president, general manager and a director of the association from May 10, 1933, to January 13, 1937, and "was during all of said time vested with and exercising the power to control and manage the business affairs and property of said Association"; that he "dictated and controlled the policies and affairs" of the association; and that "the other officers and directors had implicit faith in the supposed honesty and integrity" of said defendant. For several months prior to September 11, 1934, the association owned a piece of property in the city of Los Angeles which was improved with a fully furnished four-story brick apartment building known as the Chatham Arms Apartments. It is further alleged that on or about August 1, 1934, one Fred M. Cox, a licensed real estate broker, representing one Lillian Mercer, submitted to defendant Loynes, personally, as president and managing agent of the association, an offer to purchase said property for $62,000 net cash; that thereafter the Beverly Hills National Bank & Trust Company, as escrow agent for said Mercer, forwarded to defendant Loynes certain proposed escrow instructions which provided for the sale of said property to said Mercer for said net cash amount; that on or about August 30, 1934, the said Cox, as agent for said Mercer

offered to pay the sum of $63,500 net cash for said property; that said last-mentioned offer was communicated to defendant Loynes; that none of the other officers or directors of the association had any knowledge of either of said offers or escrow instructions; that said proposed escrow instructions were destroyed by defendant Loynes shortly after their receipt by him. It is then alleged that at or about the time of said last-mentioned offer the defendant Loynes entered into a secret parol agreement with defendant Eaton, a real estate broker of Los Angeles, whereby Eaton agreed to act, under the direction of Loynes, as a pretended purchaser of the apartment house and Loynes agreed to arrange the pretended sale to him for a sum considerably less than $63,500 and that Eaton would then sell the property to Lillian Mercer, through Cox, the real estate broker, for $63,500, and that Eaton's profit on the transaction would be divided between him and Loynes. It is further alleged that in pursuance of said agreement with defendant Eaton, the defendant Loynes, in utter disregard of the trust and confidence reposed in him as an officer and director of said association, arranged for a pretended sale of the apartment house and furnishings and certain trust deed notes belonging to the association to Eaton, through an escrow at the Farmers & Merchants Bank of Long Beach at a cash price of $55,329.06, less certain title and escrow charges. The transaction was to be handled through the National Company, Ltd., which was alleged to be a wholly owned subsidiary of the association; that on August 31, 1934, Loynes caused an application to be filed with the then Building and Loan Commissioner, Louis Drapeau (now Judge Drapeau of Ventura County), for approval of a transaction involving the exchange of said Chatham Arms Apartments and a certain trust deed note upon which there was a balance due of $9,196.18, known as the association's loan No. 12156, for outstanding certificates of the association of the face value of $147,900, naming the defendant Eaton as the purchaser. (Under an amendment to the Building and Loan Law in 1933, chapter 31 of the Statutes of 1933, building and loan associations were permitted, during the period here involved, to exchange their properties for their outstanding investment certificates, subject, however, to the approval of the Building and Loan Commissioner. At the time of the transaction herein alleged, the investment certificates of the said association were apparently selling on the market at or about 40 per cent of their face

value.) The said application was approved by the commissioner. It is further alleged that Loynes advised Cox, the broker, that Eaton had an exclusive listing on the Chatham Arms Apartments, and that Eaton had authority to enter into an escrow for the sale of the property on his own behalf and that all further negotiations should be with Eaton; that accordingly on August 30, 1934, Eaton, pursuant to directions from Loynes, entered into an escrow at the Beverly Hills Bank and Trust Company, whereby he agreed as owner to sell said apartment house property to Lillian Mercer for $63,500 in cash, less certain deductions for title and escrow charges; that on September 11, 1934, Loynes caused the association to execute a grant deed to the Chatham Arms Apartments and a bill of sale to its furnishings, conveying said property direct to Lillian Mercer; that said deed and bill of sale were delivered into escrow in the Farmers & Merchants Bank at Long Beach and that on September 14, 1934, said bank, acting upon instructions of the defendants, transmitted said deed and bill of sale to the Eaton-Mercer escrow in the Beverly Hills Bank and Trust Company, with instructions to remit the net proceeds to the Long Beach bank; that on October 3, 1934, the Beverly Hills bank forwarded to the escrow at the Long Beach bank $63,294.64 cash; that the Long Beach bank paid $54,858.55 of this sum to the National Company, through which the association handled the deal; that the balance of $7,398.59 was paid by check to Eaton on October 4, 1934; that he cashed said check in the presence of Loynes and delivered the money to Loynes "who thereupon appropriated the same to his own use and benefit as a secret profit for which he gave no consideration whatever"; that thereafter a portion of said sum, the exact amount of which is unknown to plaintiff, was remitted by Loynes to Eaton as the latter's share of the money thus wrongfully appropriated.

It is also alleged that at some time prior to September 28, 1934, the defendant Eaton, acting under the instructions of Loynes, caused fully secured trust deed notes of the aggregate value of $11,177.36, which he had acquired in connection with said transaction, to be transferred to certain third parties in exchange for the yacht "Phantom" which said yacht was transferred to the Sierra Investment Company, a corporation wholly owned and controlled by Loynes; that said yacht was reasonably worth the price paid therefor, to wit: $11,177.36; that between the 11th and 28th days of September, Loynes,

acting for himself and in his personal interest, deposited $4,773.79 in an escrow in the Long Beach bank as the sole consideration paid by him or the Sierra Investment Company for said yacht and on said last-mentioned date said sum was, pursuant to the request and instructions of Loynes, remitted by said bank to said National Company as the consideration purportedly paid by Eaton for said trust deed notes. It is then alleged that the aggregate sum of $59,632.34 (consisting of $54,858.55 realized from the Chatham Apartments deal and $4,773.79 realized from trust deed notes), which was remitted to the National Company, was used to purchase outstanding investment certificates of the face value of $147,900, which said certificates were delivered to the association and cancelled in accordance with the petition for the exchange of property for certificates which had been approved by the Building and Loan Commissioner; that due to the clever manner in which said transaction was manipulated by the defendants, nothing appeared upon the books or records of the association to indicate any irregularity in said transaction.

It is further alleged that throughout said transaction the defendant Eaton acted purely as a dummy and that no part of the purchase price for said property was advanced by him; that the defendants concealed from the other officers and directors of the association the fact that an offer had been made to purchase the Chatham Arms Apartments and furnishings for any sum in excess of that for which the property was purportedly sold to Eaton, to wit, the net sum of $54,858.55 in cash; that none of the other officers and directors had any knowledge whatever of the actual price paid by Mercer for said property; that the defendants represented to the other officers and directors of the association that the sale to Eaton was bona fide; that Eaton, after having purchased said property and while the transaction was still in escrow, but before the association had executed its deed, had sold it to Mercer; and that by means of said fraudulent scheme the association was defrauded of the sum of $7,398.59.

By his pleading plaintiff also lays a foundation for the recovery of exemplary damages because of the alleged fraud of the defendants.

Plaintiff prays judgment against the defendants for "actual damages" in the sum of $7,398.59, together with interest thereon from October 4, 1934, at the rate of 7 per cent per annum; "exemplary damages" in the sum of $10,000; and

costs of suit "together with such other and further relief as the court may deem just and proper."

By their answer the defendants denied the charges of fraud and the retention of secret profits and pleaded the statute of limitations in bar of the action. They did not seek any affirmative relief.

■ Plaintiff's first contention is that the court erred in denying his plea for a trial by jury. He bases this contention upon the theory that this is an action at law and that he is therefore entitled to a jury trial under the Constitution. Defendants, however, contend that plaintiff's alleged cause of action is in equity and hence he is not entitled to a jury trial as a matter of right. Considering the pleadings in their entirety (*Hutchason* v. *Marks* (1942), 54 Cal.App.2d 113 [128 P.2d 573]), it is our opinion that the plaintiff's position must be sustained.

Notwithstanding the complexity of the transactions and the circuitous procedure adopted to accomplish the simple transfer of ownership of the Chatham Arms and its furnishings from the association to Lillian Mercer and the allegations of the amended complaint with reference to the disposition of certain trust deed notes and the acquisition for defendant Loynes of the yacht "Phantom," plaintiff's cause of action may nevertheless be reduced to very simple terms, viz., an action to recover a judgment against the defendants for $7,398.59 (plus interest), which represents the amount the defendants are charged with having personally received out of the Chatham Arms deal through their alleged fraudulent handling of that transaction but which should have gone to the association or have been used for its benefit in the purchase of its outstanding investment certificates.

It is true that the basis of the action is the breach of fiduciary duty in that Loynes was one of the officers of the association and hence owed to it the duty of fair dealing and is alleged to have violated that duty and, with the aid of defendant Eaton, to have profited personally at the expense of the association. Equitable principles furnish the standard by which to measure the conduct of the defendants in this transaction. When this standard is applied the result is, insofar as the pleadings are concerned, that the defendants have a specific sum of money out of which they have defrauded the association, and which, therefore, they are not entitled to retain. (*Western States Life Ins. Co.* v. *Lockwood* (1913),

166 Cal. 185 [135 P. 496]; *Bainbridge* v. *Stoner* (1940), 16 Cal.2d 423, 427 [106 P.2d 423].) From the fact that equitable principles are thus used to establish the alleged liability of the defendants, it does not necessarily follow that the action to enforce that liability is equitable. The law courts now recognize and apply many equitable principles and grant relief based thereon where, as here, legal relief is sought in the form of a judgment for a specific amount. (See *Philpott* v. *Superior Court* (1934), 1 Cal.2d 512 [36 P.2d 635, 95 A.L.R. 990]; *McCall* v. *Superior Court* (1934), 1 Cal.2d 527 [36 P.2d 642, 95 A.L.R. 1019]; *Crouser* v. *Boice* (1942), 51 Cal.App.2d 198 [124 P.2d 358]; and *Money Had and Received, an Equitable Action at Law,* by Judge Edward T. Bishop, 7 So.Cal.L.Rev. 41.) None of the extraordinary powers of a court of equity are required in order to give plaintiff the relief that he seeks. A court of law can afford complete relief. It is thus apparent that this action is one at law. (*Austin* v. *Wilcoxson* (1906), 149 Cal. 24 [84 P. 417]; *Fallon* v. *Sockolov* (1921), 55 Cal.App 33 [202 P. 909]; *Johnstone* v. *Morris* (1930), 210 Cal. 580 [292 P. 970].)

In support of their theory that this is an action in equity the defendants point to the allegation in the amended complaint where the $7,398.59 here sought to be recovered from the defendants is referred to as "a secret profit." Such is not an inappropriate designation or description. According to the amended complaint a profit in that amount was made on the Chatham Arms deal by the defendants and it was secretly made. But it does not follow that in order to recover said amount plaintiff must go into a court of equity for relief since all he asks is a personal judgment against the defendants. Furthermore, the designation of this money as "a secret profit" loses any equitable significance it might otherwise have when the context in which it is used is considered. The allegation is that "the sum of $7,398.59, was paid by check on October 4, 1934, to the said Eaton, who then and there cashed said check in the presence of the defendant Loynes and paid and delivered said sum in money to the defendant Loynes who thereupon appropriated the same to his own use and benefit as a secret profit for which he gave no consideration whatever." It is plain from this language that the gravamen of the allegation is that Loynes wrongfully appropriated the said money to his own use and benefit, and without giving any consideration therefor.

In further support of their theory that this is an equitable action defendants point to the allegation that "thereafter a portion of said sum [realized from cashing the aforesaid check], the exact amount of which is unknown to plaintiff, was remitted by the defendant Loynes to the defendant Eaton, as his share of the money thus wrongfully appropriated." It is argued that since plaintiff does not know the amount Eaton got out of this transaction, there should be an accounting to determine the amount plaintiff is entitled to recover from him. The fallacy of this argument is that if plaintiff is able to establish the fraudulent scheme which he has alleged, his recovery against Eaton will not be limited to the amount the latter got out of the deal. (*Swasey* v. *de L'Etanche* (1936), 17 Cal.App.2d 713, 718 [62 P.2d 753].)

Defendants rely upon *Western States Life Ins. Co.* v. *Lockwood, supra; Winchester* v. *Howard* (1902), 136 Cal. 432 [64 P. 692, 69 P. 77, 89 Am.St.Rep. 153]; *Dean* v. *Shingle* (1926), 198 Cal. 652 [246 P.2d 1049]; *Woolsey* v. *Woolsey* (1932), 121 Cal.App. 576 [9 P.2d 605]; and *DeGarmo* v. *Goldman* (1942), 19 Cal.2d 755 [123 P.2d 1]. None of these cases sustain their contention. The Lockwood case was an action to recover an alleged secret profit which it was claimed the defendant, as president and director of the plaintiff corporation, had made at its expense. A judgment on the pleadings was granted on the ground that the complaint did not state facts sufficient to constitute a cause of action. The sufficiency of the complaint, says the court, was the only question presented on the appeal. The court held that a good cause of action was stated since "under well settled equitable principles, no director could lawfully make any secret profit for himself" in violation of his fiduciary duty to the corporation. This principle, of course, directly supports the plaintiff's position in the instant case. There is no suggestion, however, in the Lockwood case that such recovery could only be had in an equity court. The Winchester and Dean cases were brought under section 3 (since repealed on November 4, 1930) of article XII of the state Constitution to enforce the liability of corporate directors to creditors and stockholders for money misappropriated by the officers of the corporation. These actions were held to be properly on the equity side of the court "where all the creditors are parties, or are represented, and in which there can be an accounting and equities adjusted after all the facts have been ascertained." (*Winchester* v.

*Howard, supra,* p. 441; *Dean* v. *Shingle, supra,* p. 660.) Any recovery would constitute a fund for the benefit of all the creditors. If, after satisfying their claims, any of the fund remained, it would belong to the stockholders. In the instant case there is no need for an accounting nor are there any equities to adjust. In the Woolsey case the action, says the court, was "instituted to declare a trust in a joint savings bank account." It is therefore plainly a case in equity. In the DeGarmo case the court held that an action to remove directors of a corporation under section 310, Civil Code, for gross abuse of their authority and for alleged fraudulent and dishonest acts is of equitable cognizance. The case, however, has no application to our problem.

Defendants point to the allegations of the amended complaint with reference to the manner in which defendant Loynes is alleged to have acquired the yacht "Phantom" in exchange for trust deed notes of $11,177.36, which he obtained in his dealings with the association for $4,773.79, and insist that under these allegations and plaintiff's prayer for general relief he would have been entitled to a decree that the yacht was held in trust for the association or for an accounting of Loynes' profits in the transaction. The amended complaint did not pray for such relief and it does not appear that the formal prayer for general relief was intended to be an appeal to the equitable powers of the court. It was not alleged that the purchase of the yacht was embraced within the alleged plan and agreement of Loynes and Eaton, nor was it alleged that there had been a belated discovery of the facts in the yacht transaction, which would have been necessary in order to state a cause of action arising out of it. The plaintiff, therefore, was not entitled to any relief based on the yacht transaction. Neither the amended complaint nor the answer alleged that the sale of the apartment property and the sale of the trust deed notes constituted a single transaction. As previously noted the apartment property was sold to Lillian Mercer. That transaction was concluded on October 4, 1934, when the Long Beach bank paid the National Company $54,858.55 from the proceeds of said sale and delivered to Eaton the check for $7,398.59. Mrs. Mercer did not acquire any of the trust deed notes. She did not own the yacht "Phantom." The yacht deal was made with other parties. The money which was paid for the trust deed notes, according to the allegations of the amended complaint, was transmitted to the National Company

by the Long Beach bank "pursuant to the request and instructions" of Loynes, on September 28, 1934. This was six days before the bank made the payments to the National Company and Eaton on the sale of the apartment property. The inclusion of the association's loan No. 12156 with the apartment property in the application to the Building and Loan Commissioner for authority to exchange said properties for outstanding investment certificates of the association of the face value of $147,900 does not make one transaction out of that which the amended complaint shows was, in fact, two separate deals. No facts were alleged which would have made it necessary to inquire into the purchase of the yacht.

The court received evidence offered by defendants for the evident purpose of showing that any profits made in the real estate sale were used in the purchase of the yacht and that the association received the full benefit of them. The answer did not plead this defense but if all the facts testified to had been pleaded, the action would still have been one at law. In this action for money, proof that there had been an expenditure of the money, authorized by the association and for its benefit, would have constituted a good defense, but a judgment sustaining it would not have required the exercise of the equitable powers of the court.

Plaintiff was entitled to a trial by jury. (Cal. Const., art. I, § 7; *Farrell* v. *City of Ontario* (1919), 39 Cal.App. 351 [178 P. 740]; *Pacific Western Oil Co.* v. *Bern Oil Co.* (1939), 13 Cal.2d 60 [87 P.2d 1045]; *Connell* v. *Bowes* (1942), 19 Cal.2d 870 [122 P.2d 456]; *Hutchason* v. *Marks, supra.*)

The defendants contend, however, that even if the plaintiff were entitled to a trial by jury, nevertheless the error was not prejudicial because the amended complaint shows on its face that the alleged cause of action is barred by the three-year statute of limitations. (Code Civ. Proc., § 338.) As previously noted the transaction on which plaintiff bases his cause of action took place during August, September and October, 1934, and the complaint was not filed until June, 1940. In order to maintain his action it was therefore necessary for plaintiff to plead that he did not discover the facts constituting the fraud until within three years prior to the date he filed his complaint. As pointed out in *Bainbridge* v. *Stoner, supra,* 16 Cal.2d 423, 430: "The word discovery as used in the statute is not synonymous with knowledge. And the court must determine, as a matter of law, when, under the

facts pleaded, there was a discovery by the plaintiff, in the legal sense of that term. Consequently, an averment of lack of knowledge within the statutory period is not sufficient; a plaintiff must also show that he had no means of knowledge or notice which followed by inquiry would have shown the circumstances upon which the cause of action is founded. Moreover, he must also show when and how the facts concerning the fraud became known to him. (*Lady Washington C. Co.* v. *Wood,* 113 Cal. 482 [45 P. 809]; *Consolidated R. & P. Co.* v. *Scarborough,* 216 Cal. 698 [16 P.2d 268]; *Turner* v. *Liner,* 31 Cal.App.2d 196 [87 P.2d 740].)'' For a comprehensive treatment of these questions and an exhaustive collection of the authorities thereon, see *Hobart* v. *Hobart Estate Co.* (1945), 26 Cal.2d 412, at p. 436, et seq. [159 P.2d 958].

■ For the purpose of complying with these rules and showing that his cause of action is not barred by the statute of limitations, plaintiff repeated certain allegations with respect to the confidence of the other officers and directors in Loynes, and their reliance on his honesty and integrity; that he concealed from them the fraudulent plan and scheme by which he and Eaton made a profit from the transaction; that the other officers and directors did not know that an offer had been made by Cox to purchase the apartment house property for $63,500; that throughout the transaction Loynes represented to the other officers and directors that said property was being sold to defendant Eaton at the best price obtainable; that from May, 1933, to January, 1937, Loynes, as president, director and manager, personally managed and controlled all the business of the association and its subsidiary, the National Company, Ltd. It is further alleged that none of the other officers or directors had or acquired any knowledge of the secret profit obtained by the defendants or that the property was sold for a sum less than was originally offered therefor and that nothing appeared in the books and records of the association to indicate these facts. In this connection it is further alleged that the Building and Loan Commissioner examined the affairs of the association at least once each year as required by law, and that the books of the association were audited by certified public accountants at least once each year, but that in none of said examinations or audits were any facts or circumstances discovered which caused or should have caused a person exercising reasonable care to discover the fraudulent conduct of the defendants; that in the course of an investigation into the affairs of the association in the early part of

1936 a deputy investigator of the Building and Loan Commissioner discussed the transaction in question with the defendants, Loynes and Eaton, and at that time both of said defendants stated that the sale of the Chatham Apartments to Eaton was bona fide and that Eaton had actually purchased said property on his own account and had actually furnished the money with which to purchase the same; that neither of said defendants ever revealed to the Building and Loan Commissioner, or any of his deputies or agents, or to any of the other officers, directors or stockholders of the association, the fact that a larger offer had been made for the purchase of said property than was actually received by the association, or the fact that Eaton had paid all or any part of the profit made in the transaction to Loynes.

With respect to the facts and circumstances leading to the discovery of the alleged fraudulent acts on the part of the defendants, the amended complaint shows that on or about the 17th day of April, 1940, Eaton was being questioned by C. Roy Smith, one of the attorneys for plaintiff (the association had been taken over in January, 1940, for liquidation by the predecessor in office of the plaintiff herein, and Smith was attorney for the then commissioner as such liquidator). It is further alleged in the amended complaint ''that in the course of said examination, the defendant, Eaton, at first asserted that he had purchased said Chatham Apartments in his own behalf and that he had furnished the money himself but after a considerable number of questions had been asked and answered said defendant became panicky when asked whether he had reported the profits made on said transaction in his Federal Income Tax Return for the year 1934 and finally stated to said Smith: 'I am simply tired covering up Dick's (meaning the defendant, Loynes) shady deals; I am too old and I am going to tell you the truth about the whole thing'; that thereafter said defendant admitted that he participated in said transaction merely as an accommodation to the defendant, Loynes, that he had signed all of the documents and entered into the various escrows at the request and upon the direction of the defendant, Loynes, and that he had cashed the $7,398.59 check in the presence of and paid the entire proceeds to the defendant, Loynes. That the only persons who had any knowledge of the fact that the defendant, Loynes, made the secret profit in question were the defendants, Loynes and Eaton, and that neither plaintiff nor any of the directors,

officers or stockholders of said Association had any way of discovering said facts until the defendant, Eaton, consented to reveal the same as heretofore related. That the defendant, Loynes, always has and still does refuse to admit the fact that he received any portion of said secret profits or that the defendant, Eaton, was not a bona fide purchaser of said property or that either of the defendants have been or are guilty of any breach of trust or fraudulent conduct.''

The foregoing allegations clearly show under what circumstances and when, in fact, the alleged fraud of the defendants was discovered. The allegations are also sufficient to show why it was not sooner discovered. The other directors and officers had confidence in and relied on the honesty and integrity of the defendant Loynes. There was no reason for them to suspect that the Chatham Arms was not being sold to Eaton for the best price obtainable. There was nothing in the books or records of the association to indicate a better price had been offered or that a secret profit had been made. There is, therefore, no reason shown or suggested as to why the other officers and directors should have investigated this particular transaction. It does not appear from the allegations of the amended complaint that the annual audits of the association revealed any irregularities with respect to the deal. It does appear that in examining into the affairs of the association in 1936 a representative of the Building and Loan Commissioner discussed the transaction with the defendants and was told that Eaton had purchased the property on his own account and had furnished the money with which to make said purchase. It was not revealed to the representative of the commissioner that a larger offer had been made for the purchase of the property or that any portion of the profit had been paid over to Loynes by Eaton. It seems clear from the allegations of the amended complaint that Loynes took pains to conceal the alleged fraudulent character of the transaction. In this connection it is alleged that Loynes destroyed the proposed escrow instructions that were sent to the association by the Beverly Hills Bank which contained the first Mercer offer of $62,000. It is also alleged that the fraudulent plan and scheme of the defendants ''was secretly executed''; and that they were the only persons who knew that a secret profit had been made. The transaction on its face appeared regular. There was no reason to suspect fraud on the part of the defendants. ■ They contend, however, that when the other officers and directors

learned that Eaton had resold the apartment property before the purported sale to him had been completed they should have investigated the transaction. It is not unusual for the purchaser of real property, and particularly a person engaged in that business, to sell, exchange or trade property he is acquiring before his purchasing escrow is closed. Hence, it cannot be said as a matter of law that the reported resale by Eaton should have caused the board of directors to suspect that the trusted and respected president and manager of the association had been a party to any fraudulent scheme in disposing of said property and that therefore they should have investigated the transaction. (*Hobart* v. *Hobart Estate Co., supra,* 26 Cal.2d 412, 440.)

Under the circumstances as disclosed by the allegations of the amended complaint it is difficult to see how the other officers and directors of the association could have been expected to make or cause to be made any other or further investigation into the particular transaction, or how they can be charged with knowledge or notice of facts or circumstances which, if reasonably pursued, would have led to the discovery of the alleged fraud. In this connection it is to be noted that Loynes is alleged to have "personally managed and controlled all the business of said association and its said subsidiary, the National Company" and that he did not sever his connection until more than two years and three months after this transaction was concluded. In view of his relation to the association the observation of the court in *Bainbridge* v. *Stoner, supra,* 16 Cal.2d 423, is particularly applicable. It is there said (p. 430) that the "rule has been somewhat relaxed, so far as the requirement of allegations stating the circumstances which are relied upon by the plaintiff as excusing discovery of the fraud are concerned, in cases involving confidential relationship." In the Hobart case, *supra,* p. 440, the court points out that it is recognized that in cases involving a fiduciary relationship "facts which would ordinarily require investigation may not excite suspicion, and that the same degree of diligence is not required." The defendants, however, seek to avoid the full effect of this principle by pointing out that Loynes severed his connection with the association in January, 1937, and that this action was not filed until June, 1940. They argue that no diligence is shown on the part of the officers and directors, after Loynes was no longer head of the association, to discover the alleged fraud in the Chatham Arms transaction and that

no sufficient reason appears why the discovery was not sooner made. In passing on these questions consideration must be given to the way the deal was handled, the time that had elapsed, the previous and subsequent audits, the investigations that had been made of the association's affairs, the investigation of this particular transaction in 1936 by a representative of the Building and Loan Commissioner who talked to the defendants about it, and the other matters to which we have alluded. It is unnecessary to repeat them. No facts were alleged which would have caused the officers or directors to suspect any dishonesty in the transaction. The allegations of the amended complaint are sufficient as against the plea of the statute of limitations.

Defendants further contend that the alleged appropriation by them was settled and liquidated by the Building and Loan Commissioner with the full knowledge of the association, hence no prejudice could be suffered by the denial of a jury trial. This contention is based on the fact that in 1936 following a report dated June 15, 1936, to Building and Loan Commissioner Drapeau, by Milton O. Shaw, chief examiner, the commissioner required Loynes to turn over to the association additional investment certificates in the face amount of $13,714. An examination of said report and consideration of the testimony of Judge Drapeau, Examiner Shaw, witness Madson and the several entries in the association's books with respect to the Hanson trust deed note, would have furnished ample support for a finding by the trier of fact (a jury, had there been one) that the settlement related only to an alleged profit made by Loynes in connection with the sale of the trust deed notes and the acquisition of the yacht ''Phantom'' in the name of Sierra Investment Company on September 28, 1934, and had nothing whatever to do with the Chatham Arms deal which was closed on October 4, 1934. Furthermore, defendants did not allege in their answer that they had made a settlement of plaintiff's claim; they only denied that they had made a profit, as alleged. No finding was made with reference to the claimed settlement.

Defendants also contend that plaintiff has based his cause of action on only a part of the transaction and has abandoned the remainder, hence no ground for damages could possibly be established. This argument is founded on the proposition that the sale of the Chatham Arms Apartments, and the disposition of the trust deed notes and the acquisition

of the yacht "Phantom" and the other matters in relation thereto constituted a single transaction. . However, a jury might reasonably have come to the conclusion from the testimony of Eaton, his statements to witnesses Smith and Shaw and from the several escrows, that the two transactions were in fact separate deals. This contention is therefore without merit.

Defendants also argue that the evidence shows without contradiction that the association suffered no loss. We do not so view the evidence. As pointed out above, a jury might reasonably have concluded that the sale of the Chatham Arms, and the deal involving the trust deed notes and the yacht were separate transactions. With substantial evidentiary support, a jury could also have concluded that defendant Loynes arranged to handle the Chatham Apartment deal through Eaton so as to net the association less than had previously been offered by Cox on behalf of Lillian Mercer, and that the defendants personally kept the difference. Under such implied findings a jury would necessarily have concluded that the association did suffer a loss and return a verdict accordingly for the plaintiff. Proof that the association had received all that it was entitled to as the price of the trust deed notes would not establish the fact that it had not sustained a loss in the real estate transaction by its failure to receive the full amount for which the property was sold.

In their briefs, which consist of approximately 400 pages, counsel for the respective parties have devoted considerable space to arguing whether or not the evidence supports the findings. In view of our conclusions it is not necessary to consider that question.

The judgment is reversed.

Shinn, Acting P. J., and Wood, J., concurred.

A petition for a rehearing was denied May 23, 1946, and respondents' petition for a hearing by the Supreme Court was denied June 20, 1946.