[Civ. No. 19993. Second Dist., Div. Three. June 2, 1954.]

LIONEL TOGNAZZINI et al., Appellants, v. VALERIO TOGNAZZINI et al., Respondents.

Heller, Ehrman, White & McAuliffe for Appellants.

Twitchell & Rice, T. A. Twitchell, Overton, Lyman, Prince & Vermille and Donald H. Ford for Respondents.

VALLÉE, J.—Appeal by plaintiffs from an adverse judgment in a suit to impress a constructive trust on, and for an accounting of profits from, an undivided one-ninth interest in Los Alamos ranch in Santa Barbara County, legal title to which is in defendants.

The basis of the suit is that in the year 1913 defendant Valerio Tognazzini, while acting as guardian of the estates of plaintiffs, who were then minors, allegedly was guilty of a breach of trust by self-dealing and failure to make full disclosure in the partition of several family realty holdings, pursuant to which Valerio received an undivided one-ninth interest in Los Alamos ranch which had been held as part of the guardianship estates.

Antonio and Maddalena Tognazzini were the parents of Valerio Tognazzini, Virgil Tognazzini, and Clelia Hansen. Virgil and Ida Tognazzini were the parents of plaintiffs Lionel and Ellid Tognazzini.

Antonio died in 1906 the owner of three ranches: Los Alamos and Casmalia in the Santa Maria area of Santa Barbara County, and Cayucos in San Luis Obispo County. Maddalena inherited an undivided half interest and Valerio, Virgil, and Clelia each an undivided one-sixth interest in each of the ranches.

Virgil died in 1908 and his one-sixth interest descended in equal shares to Ida and plaintiffs Lionel and Ellid. Plaintiffs each then owned an undivided one-eighteenth interest in each of the three ranches. In December 1909, Valerio, with the consent of Ida, was appointed guardian of the estates of Lionel and Ellid. Ida and plaintiffs were residing in Switzerland at the time. Among the assets of the guardianship estate was plaintiffs' undivided one-ninth interest in the three ranches. Ida and plaintiffs returned to California in 1912.

About August 1912, Ida and Clelia came to the conclusion that a partition of the ranches should be effected to the end that Valerio should own one ranch, Clelia another, and Ida

and plaintiffs the third. At this time Maddalena owned an undivided half interest in each ranch, Valerio and Clelia each an undivided one-sixth, and Ida and plaintiffs each an undivided one-eighteenth. Ida and Clelia engaged an attorney, Emilio Lastreto; Valerio was notified of the desire to partition; and a meeting was arranged. Ida and Clelia designated appraisers. The appraisers appraised the property at, and the parties agreed on a valuation of, $90,000 for Los Alamos, $100,000 for Casmalia, and $55,000 for Cayucos. It was decided that Ida and plaintiffs should take Cayucos. It was decided that Ida and plaintiffs should take Cayucos because its lower valuation would result in their receiving cash of which they were in need and because they did not have the cash to take either of the higher priced ranches. Valerio and Clelia tossed a coin twice to decide who would take Los Alamos and who Casmalia. If heads came on the first toss Clelia was to take Casmalia, if tails came Valerio was to take it. Heads came but Clelia was undecided; the coin was tossed again; it came heads again and Clelia took Casmalia. That left Valerio with Los Alamos.

On February 13, 1913, a written contract drawn by Lastreto, embodying the terms of the partition, was signed by Valerio in his individual capacity and as guardian of the estates of plaintiffs, by Ida in her individual capacity and as mother of plaintiffs, and by Clelia. The contract provided that it should not be binding on plaintiffs until it should have been approved by the court.

On March 10, 1913, Valerio tendered to the court his resignation as guardian of the estates of plaintiffs. Ida petitioned for appointment, and in her petition stated: "[I]n view of the fact that it is contemplated between Madalena Tognazzini, Mrs. Clelia Muscio (nee Tognazzini), Valerio Tognazzini, and the said minors, Lionel Tognazzini and Ellid Tognazzini, and your petitioner, Ida Tognazzini, to have a partition of the property belonging to themselves in common and in different proportions; and that in said partition proceedings, your petitioner herein desires to represent and to act for her said children, said minors, and that Valerio Tognazzini, the said guardian of the persons and estates of said minors has, at the request of petitioner herein, tendered his resignation as such guardian and petitioned the Honorable Superior Court to accept his said resignation and to appoint your petitioner, Ida Tognazzini, such guardian instead and in lieu of Valerio Tognazzini." On March 31,

1913, Valerio's resignation was accepted and Ida was appointed.

The contract was not presented to the court for approval. Instead, Ida, as guardian of the estates of plaintiffs, petitioned the court in the guardianship proceeding for an order to sell the interests of plaintiffs in the three ranches and to use the proceeds to purchase the interests of the other parties in Cayucos and to invest in securities. On June 13, 1913, an order was duly and regularly made granting the petition and ordering the interests sold. The sale was advertised, had, and duly and regularly confirmed. The interests of plaintiffs in Los Alamos and Casmalia were exchanged for corresponding interests in Cayucos plus cash; deeds were exchanged; and Maddalena conveyed her undivided half interest in each ranch. The result was that Valerio became sole owner of Los Alamos, Clelia sole owner of Casmalia, and Ida and plaintiffs sole owners of Cayucos.

In 1920 Cayucos was sold for $90,000. About 1935 Valerio conveyed to each of his children, defendants Elton Tognazzini and Aileen Tognazzini Pauley, without consideration, an undivided one-fourth interest in the minerals in and under a part of Los Alamos. In 1937 Valerio entered into a contract with his wife, defendant Tillie Tognazzini, by which she agreed to buy an undivided one-fourth interest in the minerals in and under a part of Los Alamos for $120,000. She has paid about $80,000 toward the purchase price.

This suit was commenced on September 20, 1950. The property involved is the one-ninth interest in Los Alamos which was owned by plaintiffs and which in 1913 was conveyed by Ida, as guardian of the estates of plaintiffs, to Valerio. The alleged fraud is predicated on the claim that Valerio, occupying a fiduciary relation to plaintiffs as guardian of their estates, failed to disclose to the court in the guardianship proceedings material facts within his knowledge regarding the oil potentialities of Los Alamos, thereby obtaining an unfair advantage over his wards.

The court found there was no fraud and that the suit was barred by the provisions of section 338(4) of the Code of Civil Procedure. Plaintiffs assert the findings are unsupported by the evidence. We have concluded that the finding that the suit is barred is supported by the evidence.

Thirty-seven years elapsed between the partition in 1913 and the filing of this suit. Lionel attained the age of majority in 1923; Ellid in 1924.

On June 1, 1909, Ida granted an oil company an option for two and a half years to purchase her interest in Los Alamos; and Maddalena, Valerio, and Clelia jointly granted the same oil company an option to purchase their interests. The price fixed in the options was $250 an acre. Los Alamos contained about 4,000 acres. It had been appraised in 1908, on the death of Ida's husband, at $30,000, or about $7.50 an acre. The options were not exercised. Ida testified she knew at the time the option was given that three oil companies had producing wells in the Santa Maria area.

Ida and plaintiffs were in Switzerland from June 1909, until August 1912. During that time Valerio and Clelia's then husband managed the ranches. On September 14, 1910, Ida wrote to Valerio acknowledging she had received a long letter from him and that she was "happy to hear that the Brookshire has good prospects also the wells in our ranches." On April 23, 1911, she wrote to Valerio saying, "Victor Pezzoni tells me that they are digging for oil in Casmalia; how are they doing? I always wait to hear of a big gusher but nothing ever comes." On August 7, 1911, she wrote Valerio asking, "[D]id you come to anything with that oil well?" Presumably her letter was answered.

After Ida returned from Switzerland she lived in San Francisco. Before the partition discussions began Ida frequently visited with Maddalena and Clelia; she saw Valerio but once, in her brother's office for the purpose of receiving money. At this meeting which was before anyone had suggested a division of the ranches, Valerio asked Ida if she would like to be guardian. She replied that it was agreeable to her. Ida suggested the partition because "She felt he [Valerio] was just not quite honest with her."

On February 19, 1913, the date of the contract for partition, an oil well, Dome No. 2, was being drilled on Los Alamos. The well was completed about April 18, 1913, but it did not at any time produce oil in paying quantities and it was later abandoned. When partition was first discussed and before any ranches were selected Valerio said to Ida and Clelia, "Do not divide the mineral rights—keep them undivided." He reported to them at that time that the Dome well was drilling but that its outcome was uncertain. On objection by Ida and Clelia, Valerio agreed to divide the entire interests. During the negotiations Ida told Lastreto they always had hopes of oil in the family. Ida, Valerio, and Clelia knew that there was prospecting for oil on Casmalia at the date

of the contract. The evidence supports the conclusion that Ida knew at the time she was appointed guardian and at the time she petitioned the court to take Cayucos for herself and plaintiffs that Los Alamos and Casmalia were potential oil properties.

In 1930 a title company wrote plaintiffs requesting them to execute quitclaim deeds to Valerio to clear up a defect in the title of part of Los Alamos. Plaintiffs executed the deeds.

Maddalena died prior to 1930. Valerio and F. A. O'Connell, a lawyer, were executors of her will. In November 1930, Ida and plaintiffs consulted O'Connell about contesting Maddalena's will and suing on a claim Ida and plaintiffs asserted arose out of the 1913 contract. O'Connell showed Ida and each plaintiff the contract and told them they had no claim because Maddalena was not a party to the contract. Ida told O'Connell she had a claim against Valerio and Clelia arising out of the 1913 contract. He informed Ida and plaintiffs they had no claim—that if they had one, it was barred by the statute of limitations.

Plaintiffs and Ida employed A. W. Brouillet, a lawyer, at that time. In January 1931, a meeting was had at which Brouillet, Ida, plaintiffs, and O'Connell were present. At that meeting O'Connell and Brouillet discussed the 1913 contract, and O'Connell told those present that the 1913 contract was not efficacious or effective because it could not have been without a court order taking care of the right of the minors to make the deed. He also told them that Maddalena had not made the deed either to Valerio or Clelia free of obligation; that each had obligated himself and herself to pay Maddalena $1,000 a year as long as she lived; that Valerio had agreed not to sell or mortgage Los Alamos without the consent of Maddalena; and that there was no obligation on the part of her estate to pay any money under the 1913 contract. He told them that if there had been any claim against Valerio or Clelia the statute of limitations had run.

In 1928 Valerio entered into an oil lease of part of Los Alamos which resulted in the discovery of oil in paying quantities about July 1, 1931. Prior to that time a number of dry holes had been drilled. In late 1931 plaintiff Ellid Tognazzini told O'Connell that he had read in a Swiss paper that oil had been discovered in Cat Canyon on Los Alamos. O'Connell later talked to plaintiff Lionel Tognazzini about the matter; Lionel said oil had been discovered in Cat Canyon;

O'Connell asked what Cat Canyon was; Lionel said it was Gato Ridge, that he had read it in the public print.

In July 1932 E. J. Talbot, a lawyer representing Ida, telephoned O'Connell and said Valerio "had done" Ida out of $10,000; that there was some discrepancy in the accounting of Maddalena's estate. The two lawyers met; O'Connell explained the accounting and the 1913 contract to Talbot, and told him Valerio was under no obligation to Ida.

Valerio and O'Connell were trustees under Maddalena's will. In 1932 plaintiffs objected to their account claiming they had not accounted for all property which came into their hands under the decree of distribution and had not paid plaintiffs income due them under the trust. In 1933 plaintiffs sought the removal of Valerio as trustee of the trust. Later in 1933 plaintiffs again objected to an account of Valerio and O'Connell as trustees. The accounts were found to be true and correct and were approved.

Plaintiffs claim to have discovered the alleged fraud in this way: In June 1949, one of Valerio's present lawyers wrote to plaintiff Lionel Tognazzini indicating that a title company had raised some technical objections about the title Valerio acquired on the sale in the guardianship estate to the effect that all of Los Alamos was not included in the quitclaim deeds executed by plaintiffs to Valerio in 1930, and seeking a meeting. The lawyer met Lionel in San Francisco in June 1950, and asked that he and Ellid execute a quitclaim deed; Lionel said they did not feel they could since there was $13,000 due them. Lionel consulted Brouillet who told him to search his records. Lionel did so, and among some papers which had been delivered to him by Lastreto in 1938 he found the 1913 contract. He gave the contract to Ellid who took it to Broullet. Each plaintiff testified he had never seen the contract before. Each also testified he first learned of the oil development on Los Alamos in 1950. Plaintiffs claim that submission of the contract to Brouillet in 1950 led to their discovery for the first time that Valerio had not in 1913 disclosed that Los Alamos had oil potentialities.

An action for relief on the ground of fraud must be commenced within three years, but the cause of action is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud. (Code Civ. Proc., § 338, subd. 4.) ▇ It is not sufficient for a party merely to allege or prove that he did not make the discovery before a certain time. He must allege and prove when the

fraud was discovered, the circumstances of the discovery, what the discovery was, and why it was not discovered sooner. (*Lady Washington C. Co.* v. *Wood,* 113 Cal. 482, 486 [45 P. 809]; *Smith* v. *Martin,* 135 Cal. 247, 251-254 [67 P. 779]; *Del Campo* v. *Camarillo,* 154 Cal. 647, 657-658 [98 P. 1049]; *Phelps* v. *Grady,* 168 Cal. 73, 77-80 [141 P. 926]; *Consolidated R. & P. Co.* v. *Scarborough,* 216 Cal. 698, 701-703 [16 P.2d 268]; *Kelly* v. *Longan,* 5 Cal.2d 274, 276-277 [53 P.2d 971]; *Davis* v. *Rite-Lite Sales Co.,* 8 Cal.2d 675, 681-682 [67 P.2d 1039]; *Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412, 441 [159 P.2d 958]; *Beal* v. *Smith,* 46 Cal.App. 271, 280 [189 P. 341]; *Beck* v. *Hoagland,* 128 Cal.App. 322, 325 [17 P.2d 191]; *Merchants' Ice etc. Co.* v. *Globe Brew. Co.,* 78 Cal.App.2d 618, 623 [177 P.2d 963].) ▮ If the means of knowledge exist and the party is aware of facts which would make a reasonably prudent person suspicious, it will be held that there was knowledge of what could have been readily ascertained by such inquiry. In other words, under such circumstances means of knowledge are equivalent to knowledge. (*Smith* v. *Martin,* 135 Cal. 247, 254 [67 P. 779]; *Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412, 438 [159 P.2d 958]; *Scafidi* v. *Western Loan & Bldg. Co.,* 72 Cal.App.2d 550, 567 [165 P.2d 260]; *Mortimer* v. *Loynes,* 74 Cal.App. 2d 160, 170-172 [168 P.2d 481]; *Crabbe v. White,* 113 Cal. App.2d 356, 360 [248 P.2d 193].) ▮ When the facts are susceptible to opposing inferences, whether a party had notice of circumstances sufficient to put a prudent man on inquiry as to a particular fact, and whether by prosecuting such inquiry he might have learned such fact, are questions of fact to be determined by the trial court. (*Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412, 440 [159 P.2d 958]; *Bowman* v. *McPheeters,* 77 Cal.App.2d 795, 798, 802-803 [176 P.2d 745]; *Blackman* v. *Howes,* 82 Cal.App.2d 275, 278-279 [185 P.2d 1019, 174 A.L.R. 1004].)

A fiduciary relation did not exist between Valerio and plaintiffs in 1930 or after that time. It is conceded that plaintiffs have been close to their mother, Ida, at all times since they attained the age of majority. ▮ The court was warranted in inferring from the facts related and from Ida's manner of testifying that the 1913 contract, the relation of the parties in 1913, and the oil potentialities of Los Alamos in 1913 had been discussed between mother and sons many times, both before and after 1930. The same means of knowl-

edge existed in 1930 and thenceforth as existed in 1950. A fair inference from the evidence is that at least as early as 1930 plaintiffs were aware of facts which would make a reasonably prudent person suspicious and that the exercise of reasonable diligence on the part of plaintiffs in 1930 and at all times thereafter would have disclosed to them all they subsequently allegedly learned.

Applying the rules of law stated, the evidence is clearly sufficient to support the findings that after attaining the age of majority in 1923 and 1924 and at all times after 1930 plaintiffs and each of them were advised and had knowledge of the terms and conditions of the 1913 contract, and after 1930 had knowledge of the purchase by Valerio of their interests in Los Alamos in August 1913, of the consideration received by them therefrom, and the terms and conditions of the sales and purchases; that the facts and circumstances surrounding the sale of plaintiffs' interests in Los Alamos and the purchase thereof by Valerio should have been known to each plaintiff at all times after 1930 if he had used ordinary or any diligence to ascertain the same; that "at all times subsequent to 1939 the plaintiffs had in their possession" a copy of the 1913 contract; that the suit is barred by the provisions of section 338, subdivision 4, of the Code of Civil Procedure; and that each of plaintiffs has been guilty of laches and unreasonable delay in bringing the suit. The evidence does not compel a conclusion as a matter of law that plaintiffs had no notice prior to the time they assert discovery of circumstances sufficient to put a prudent man on inquiry as to the facts.

The defendants filed a cross-complaint in which they prayed that their respective titles in Los Alamos be quieted. As a defense plaintiffs pleaded the same alleged fraud of Valerio as pleaded in the complaint. The court found in accord with the allegations of the cross-complaint and quieted defendants' titles as against plaintiffs.

Plaintiffs say that the statute of limitations cannot be interposed to a defense of fraud,[1] and that defendant members of Valerio's family have no greater right than he.[2] Defendants appear to concede these are correct statements of the law. These contentions compel consideration of the question whether the finding of no fraud on the part of Valerio is supported by the evidence.

---

[1] *Estate of Cover*, 188 Cal. 133, 140 [204 P. 583]; *Cox* v. *Schnerr*, 172 Cal. 371, 382 [156 P. 509].

[2] *Taylor* v. *Weston*, 77 Cal. 534, 537 [20 P. 62]; Rest. Trusts, § 286; Bogert, Trusts and Trustees, § 885.

Plaintiffs argue: during the negotiations which preceded the 1913 contract and at the time of its execution they were minors; Valerio occupied a fiduciary relation to them as guardian of their estates; he acquired their interests in Los Alamos against their consent; he did not obtain approval of the court to his acting as guardian and at the same time acquiring the interests of his wards; his resignation prior to the consummation of the partition did not relieve him of the prohibition against self-dealing; when Valerio acquired their interests he failed to disclose to the court or to anyone else material facts within his knowledge regarding the oil-producing potentialities of Los Alamos. They contend the evidence is uncontradicted that Valerio was guilty of a breach of his trust as guardian by dealing with himself and by gaining an unfair advantage over them.

The court found that the 1913 contract was abandoned by the parties. Plaintiffs say the finding is unsupported. The evidence supports the finding. The contract said it was not binding on plaintiffs until approved by the court. It also stated that Ida was desirous of being appointed guardian of the persons and estates of plaintiffs. And it provided that the mineral rights "appurtenant to each and any of said three properties, are to follow and belong to said respective property." It was not submitted to the court for approval. Lastreto, Ida's lawyer, prepared Valerio's resignation and his request for Ida's appointment as guardian. The resignation stated that a division or partition of the ranches was desired and soon to be effected. Ida's petition stated that a partition was contemplated and that in the partition proceedings she desired to represent and act for plaintiffs. Instead of presenting the contract to the court for approval, Ida petitioned the court in the guardianship proceedings for an order to sell the interests of plaintiffs in the three ranches.

The 1913 contract contemplated deeds of gift from Maddalena to Valerio, Clelia, and Ida and plaintiffs. When Maddalena deeded to Valerio and Clelia she did not make gift deeds, but the deeds contained provisions obligating Valerio and Clelia each to pay Maddalena $1,000 a year so long as she lived and contained restrictions on their ability to convey.

The court was justified in concluding that Lastreto believed it was best to abandon the 1913 contract and to proceed as though it had never been entered into. This course assured plaintiffs the protection afforded by a sale in the guardianship proceeding and that they would obtain fair values for their

interests. By that course of action they were assured that the fair market value would be determined by independent appraisers, that the bidding could be competitive, that further bids could be received at the time of confirmation, and that if no adequate bid was received the court would refuse confirmation.

It is argued that even though the 1913 contract was abandoned Valerio was not thereby relieved of the prohibition against self-dealing. The argument is based on the following statement of Scott in his work on Trusts: "After a trustee has ceased to be trustee he is not necessarily precluded from purchasing trust property. If, however, he is one of several trustees and makes an agreement with his co-trustees that he will purchase the property for himself, the fact that he resigns as trustee before completing the purchase will not preclude the beneficiaries from setting aside the sale." (2 Scott on Trusts, § 170.8.) Scott cites, in support of the text, *Shelton* v. *Homer*, 5 Metc. (Mass.) 462, and *Wright* v. *Morgan*, [1926] A.C. 788. In *Shelton* v. *Homer* two executors of a will were serving One resigned. Two days later he entered into a contract with the other to buy property which the will directed should be sold. The suit was by the remaining executor to specifically enforce the contract. There were no other facts. The court concluded that the contract was agreed upon before the resignation. It was held that under the will one executor could not sell the property; and that an executor may not bargain with his coexecutor for any part of the estate of the testator, then after resignation have a conveyance made to him by the other where, as a trustee, he is still in privity with the estate. *Wright* v. *Morgan* held that a trustee while acting as such cannot agree with his cotrustee to purchase property of the trust, then resign and make the purchase; that in such case the sale will be set aside. There was no court approval of the sale in either *Shelton* v. *Homer* or *Wright* v. *Morgan*.

Scott also says (§ 170.8): "Where the trust has terminated altogether, a person who was trustee is not precluded from purchasing the property which he formerly held in trust if he does not take advantage of information acquired by him as trustee to the detriment of the beneficiaries," citing *Hosch* v. *Hosch's Ex'rs*, 181 Ky. 781 [205 S.W. 963], and *Ball* v. *Carew*, 13 Pick. (Mass.) 28. He says further (§ 170.7): "We have seen that a trustee cannot properly purchase trust property for himself individually, even though he acts in good faith and pays a fair consideration for it. The circumstances

may be such, however, that it would be advantageous to the trust estate for the trustee to purchase the property. The property may be difficult to dispose of, and the trustee may be willing to help the estate by taking it over at a fair price and at a price greater than that which any other purchaser would pay. In such a case a court having jurisdiction over the administration of the trust may approve a sale to the trustee individually. . . . Not only may the court authorize a sale of trust property to the trustee personally, but after such a sale has taken place the court may approve the sale, if it still appears that the sale is for the best interest of the trust estate. . . . The reason why the permission or approval of the court is sufficient to justify a sale of trust property to the trustee personally is that a court of equity is a court having general supervision over the administration of trusts, and if the parties are properly represented before it, it has authority to authorize what would otherwise not be permissible." (See *Tolley* v. *Hamilton,* 206 Ala. 634 [91 So. 610]; *Greenway's Guardian Ad Litem* v. *Greenway,* 262 Ky. 818 [91 S.W.2d 553, 557]; *Malone's Guardian* v. *Malone,* 255 Ky. 210 [73 S.W.2d 38]; *Terry* v. *Terry,* 305 Mass. 113 [25 N.E.2d 205, 207]; *Hayes* v. *Hall,* 188 Mass. 510 [74 N.E. 935]; *In re Fiske's Estate,* 207 Minn. 44 [291 N.W. 289]; *In re Sprain's Estate,* 199 Minn. 511 [272 N.W. 779, 111 A.L.R. 1357]; *Colgate's Executor* v. *Colgate,* 23 N.J.Eq. 372, 383.)

In *Colgate's Executor* v. *Colgate, supra,* 23 N.J.Eq. 372, a member of a firm engaged in the manufacture of soap died, naming another member of the firm executor with power to sell land. The executor made a contract to sell the interest of the decedent in land owned by the firm to the surviving members of the firm, of whom he was one. Suit was brought by the members of the firm for specific performance of the contract. One of the beneficiaries of the estate was an infant. The court held (p. 383): "The interest of the testator in the real estate may be sold by the complainant as trustee, but it must be for its present value. And when it is necessary that lands held in trust should be sold, and the trustee is in a situation that induces him to give more than any other purchaser would give, the court may authorize a sale by him, at a full, fair price, to be approved by the court, to himself, or to some one for his benefit. This was held in *Campbell* v. *Walker,* 5 Ves. 678, and by the Supreme Court of the United States in *Michoud Girod,* 4 How. (U.S.) 503. In this case, I am satisfied that the complainant and his copartners, who own

the other two-thirds of this property, can afford to give the full market value of this real estate as it stands, undivided, better than any other purchaser, who must take it subject to the right of partition and sale; and it is equitable and just, if they are willing to give the full value, that the interest of the testator should be sold to them. It is a proper case for this court to order that a sale and conveyance should be made by the complainant to or in trust for the firm of which he is a member.''

The court, in *In re Fiske's Estate, supra,* 207 Minn. 44, 291 N.W. 289, said (291 N.W. 291) : ''Self or double dealing by a fiduciary is bad. When, with full disclosure, it has proper judicial approval, it may become good because purged of vice. 2 Scott, Trusts, § 170.7; 3 Bogert, Trusts & Trustees, § 484. There is authority for the statement that 'the trustee can properly purchase trust property for himself with the approval of the court.' 1 Restatement, Trusts, § 170, comment f.

''In order that a minor may be bound by such judicial action as that now under attack, it is not necessary that he be personally represented. *Balch* v. *Hooper,* 32 Minn. 158, 20 N.W. 124; *Ladd* v. *Weiskopf,* 62 Minn. 29, 64 N.W. 99, 69 L.R.A. 785. Here appellant was represented not only by his mother as guardian of his person, but also by respondents as guardian of his estate. Both had the benefit of independent and competent counsel, with no incompatibility of interest or division of allegiance. Their whole duty was to, and their whole interest that of, appellant [a minor] and his mother, on whose behalf they participated in the settlement and its confirmation by final decree.

''Courts must deal with the estates of minors. Their judgments in that field must have the effect of finality or they would cease to be judgments. Giving what force one will to the position of respondent as one of incompatibility of interest and division of allegiance in this matter, it yet remains that every conceivable precaution was taken to insure the utmost protection for the interests of appellant. We do not even find the semblance of a reason for having the matter relitigated. We can not allow disappointment to take the place of fraud or mistake as ground for nullification of judicial action.''

*Greenway's Guardian Ad Litem* v. *Greenway, supra,* 262 Ky. 818 [91 S.W.2d 553], was an appeal from a judgment approving a sale of a minor's interest in realty to his guardian. The court stated (91 S.W.2d 557) : ''Question is made con-

cerning the right of the guardian to become a purchaser at the sale, it being argued that if she did so, her bid inured to the benefit of the infant. A number of authorities are cited as supporting this contention, and no criticism can be made of these authorities; however, it was alleged in the petition as amended that it would be to the best interest of the infant to permit the guardian to bid on the property, and permission for her to do so was granted by the court. In the case of *Larrabee* v. *Larrabee, supra,* [24 Ky.L.Rep. 1423 (71 S.W. 645)] the guardian was granted permission by the court to bid on the property when sold, and it was said: 'A guardian who bids by permission of the chancellor stands with reference to the sale as any other purchaser. It was not necessary for the infant plaintiffs to have representation other than that of their guardian. They were co-plaintiffs with her, and it was not necessary for them to have any other representation in this proceeding.' "

Section 2235 of the Civil Code provides: "All transactions between a trustee and his beneficiary during the existence of the trust, or while the influence acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration, and under undue influence."

█ Whether "the influence acquired by the trustee remains" at the time of the transaction is a question of fact. █ The presumption of section 2235 is disputable. █ Whether the presumption has been dispelled is a question for the trier of fact, whose decision will not be reversed if supported by substantial evidence. (*Weil* v. *Weil,* 37 Cal.2d 770, 788 [236 P.2d 159]; *Luiz* v. *Queen of Angels Hospital,* 53 Cal. App.2d 310, 313 [127 P.2d 966].)

█ The court was fully justified in concluding that Valerio was not guilty of fraud. He did not resign to accomplish the sale. He resigned because Ida, mother of plaintiffs, their natural guardian, wanted to be appointed in his stead. He resigned at the request of Ida and Lastreto. His resignation was agreed upon before the negotiations with respect to the division of the ranches began. The division idea was not Valerio's; it was Ida's and Clelia's. Apparently Valerio had no recourse except to go along with Ida and Clelia. There is no evidence that he resigned as a part of a plan to deprive plaintiffs of their interests in Los Alamos or that his acquisition of their interests was a part of such a plan. He had no control over, and did not attempt to in-

fluence, Ida as successor guardian. The method by which the ranches were selected negatives any plan on Valerio's part to acquire Los Alamos. He was not represented by an attorney; Ida and Clelia were. Ida was also advised by a brother and an uncle. Ida and Clelia had appraisals made of the ranches. Valerio had nothing to do with the selection of the appraisers and rendered them no assistance. He accepted their valuations. Valerio at that time knew, as did Ida and Clelia, that Dome No. 2 was drilling on Los Alamos. Notwithstanding, he did not want to partition the mineral rights, Ida and Clelia insisted. After Ida selected Cayucos for herself and plaintiffs, Los Alamos went to Valerio by lot. He took what was left after Ida and Clelia had made their choices. The chief actor from the beginning of the negotiations to the completion of the sale was Lastreto acting for Ida and plaintiffs. There is no evidence that he acted for or consulted with Valerio.

The only concealment asserted against Valerio was the alleged failure to disclose that Los Alamos had oil potentialities. Plaintiffs say there were three failures: 1. He told no one of his knowledge of a report called the Arnold report. 2. He did not tell the court of the well in process of drilling. 3. He did not disclose the Cat Canyon discovery.

The Arnold report was based on a government survey made by a geologist in 1907. Valerio received a copy of the report. The report indicated it was Arnold's opinion that the prospects for oil in some areas of Los Alamos were good. Valerio became guardian in December 1909. Ida and plaintiffs were in Switzerland from 1909 to 1912. While Ida was in Switzerland Valerio wrote her to that effect; he thus passed on to her the essence of the report. The report was six years old in 1913 when Ida became guardian and oil had not been found in paying quantities although wells had been drilled. There was evidence from which the court could infer that the Arnold report was in error as to the areas he recommended for testing on Los Alamos and that numerous dry holes had been drilled prior to 1913 in the specific areas he mentioned. The court may well have concluded there was no concealment in Valerio's failure to specifically mention the Arnold report.

The next claimed concealment is that Valerio did not tell the court during the negotiations for partition that Dome Well No. 2 was in process of drilling. The court found that Ida knew on the date of the 1913 contract and on August 15, 1913, which was four days after the sale had been confirmed by the

court in the guardianship proceedings, and at all times between those dates, of the prospecting for oil on Los Alamos and Casmalia. When partition was first discussed and before any ranches were selected Valerio said, "Do not divide the mineral rights—keep them undivided." At that meeting he told Ida, Clelia, and Lastreto "what the conditions were and developments on the ranches," and that Dome No. 2 was drilling. Clelia testified: "There were so many failures [dry holes] around the country, that we didn't get excited about it [the fact that Dome No. 2 was drilling]." Ida's petition for an order to sell alleged that all mining leases were to be included in the sales of the respective parcels. In her return of sale she stated that Valerio's bid was fair and just and represented the true value of the property. When Valerio bid he had filed his final account and had been discharged as guardian of plaintiffs. Disinterested appraisers were appointed by the court who appraised Los Alamos at $90,000, Casmalia at $100,000, and Cayucos at $55,000. They were businessmen of San Luis Obispo. Two of them were connected with the oil business. It must be presumed they knew of the drilling of Dome No. 2, and that their appraisal reflected any value based on oil potential. The sale was duly and regularly publicized by posting and publication in Santa Barbara County where the property was situated, and in San Luis Obispo County where the guardianship proceedings were pending. Anyone could have acquired plaintiffs' interests. Valerio was content to take his chances at a sale. The oil company which held a lease on part of Los Alamos did not submit a bid. Lastreto prepared all of the court papers in connection with the sale. There is no evidence that he consulted with Valerio. The sale was regularly confirmed in open court. Ida and Lastreto were present. It was Ida's duty as guardian of the estates of plaintiffs to inform the court that Los Alamos had oil potentialities if such were known to any of the parties at the time. Dome No. 2 was completed on April 18, 1913, but it did not produce oil in paying quantities. The proceedings for sale of plaintiffs' interests in Los Alamos took place between June and August, 1913. In August 1913, when the proceedings for the sale of plaintiffs' interests were pending, two dry holes had been drilled on Los Alamos and three dry holes had been drilled near the Tognazzini line. The court in this suit found that the bids and sales prices were the fair market values of the properties at the time and that the sales were fair and just. The evidence

supports the conclusion that there was no concealment on the part of Valerio with respect to Dome No. 2.

The next alleged concealment is that Valerio did not disclose the Cat Canyon discoveries made in 1910. One discovery was on property lying generally about 4 miles west of Los Alamos. Another was made about $2\frac{1}{2}$ miles north of Los Alamos. It does not follow from the fact that oil was found on one property in the Santa Maria area that there was oil in all areas.

We conclude that the findings that at the time of the sale the presence of oil on Los Alamos was not known to Valerio; that at the time the sale was confirmed Ida was not unaware of the value of plaintiffs' interests and the court was not unaware of their value; that the price paid by Valerio was the fair market value of plaintiffs' interests at the time of the purchase; and that Valerio's conduct in purchasing the interests of plaintiffs was not fraudulent and was in all respects fair to plaintiffs, are supported by the evidence.

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 28, 1954.