Judith Wilder BRISKIN, Manuel F. Rothberg, Marshall Irwin Siskin, et al., Appellants,

v.

ERNST & ERNST, a Co-Partnership, Newton Glekel, Mark Williams, et al., Appellees.

No. 75–2851.

United States Court of Appeals, Ninth Circuit.

Dec. 15, 1978.

Peter Abrahams, Los Angeles, Cal., for appellants.

Joel B. Gardner, Michael B. Targoff, Bartlett H. McGuire, New York City, for appellees.

Before MERRILL, GOODWIN and TANG, Circuit Judges.

GOODWIN, Circuit Judge:

A group of former shareholders of a closely held furniture company (Sloane) [1] sued officers and agents of Beck Industries, Inc., and Beck's accounting firm, for damages arising out of losses sustained by Sloane shareholders following the acquisition of Sloane by Beck. The cases were dismissed as time-barred, and the shareholders appeal.

Two actions were commenced on June 13, 1973, by nine Sloane shareholders. One was against Ernst & Ernst, Beck's accounting firm; the other, against the other appellees. A few days later, the nine attempted by another complaint to convert the actions into class actions, but the district court denied certification. Thereafter, the two cases proceeded as one, and through joinder combined the claims of 45 shareholders. We treat the cases as consolidated.

The theory of liability is that the individual defendants made material misrepresentations in the negotiations leading up the acquisition of Sloane by Beck, and that the accounting firm was "reckless" in failing to reveal inaccuracies in Beck's financial statements.[2]

The only question before us is, when did California's three-year statute of limitations begin to run?

All parties agree that the applicable statute of limitations is Cal.Civ.Proc.Code § 338(4). This court has held that Section 338(4) applies in actions brought in California under Section 10(b) of the Securities Exchange Act. *United California Bank v. Salik*, 481 F.2d 1012 (9th Cir.), *cert. denied*, 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973).

Cal.Civ.Proc.Code § 338(4) provides that an action for fraud must be brought within three years after the cause of action has accrued, but that "[t]he cause of action in such case [is] not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." The district court held as a matter of law that the relevant "discovery" occurred more than three years before June 13, 1973.

The negotiations between Beck and Sloane began in October of 1968 when defendant Charles McDevitt telephoned one of the Sloane directors to discuss the possible acquisition of Sloane by Beck. As a result of this call, on October 9, 1968, McDevitt met with plaintiffs Irwin and Bernard Greenberg in Los Angeles. McDevitt told them that the Beck management planned to transform Beck from a women's shoe company into a fashion conglomerate. McDevitt stated that Beck was in strong financial condition and was capable of implementing its planned acquisitions without difficulty.

On November 5, 1968, McDevitt met with the board of directors of Sloane and made representations to the members about Beck's financial strength. McDevitt stated at this meeting that Beck's shoe inventory

---

1. In addition holding shares in W. & J. Sloane of Beverly Hills, Inc., plaintiffs also owned Angelus Manufacturing Co., another furniture company that was purchased along with W. & J. Sloane by Beck Industries, Inc. Because nothing turns on the names of the corporations, we refer generally to Sloane and Angelus and their shareholders as "Sloane" and "the Sloane shareholders".

2. Because the district court terminated the case on the statute-of-limitations points, it did not reach the question whether the accounting firm

could be held liable on the theories advanced in the various amended complaints. After this appeal was docketed, the Supreme Court held in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), that an action for damages under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 will not lie in the absence of scienter. We do not apply or distinguish *Hochfelder* here, as the point was not passed upon by the district court.

was valued at $12,000,000. He asserted that not more than ten per cent of the shoes in the inventory were out of style and unsaleable. (These points later were alleged as fraud.)

Because the Sloane shareholders were too numerous to participate directly in the negotiations with Beck, they agreed to have the Greenbergs, Manuel Rothberg, and Leo and Marshall Siskin (all stockholders active in the management of Sloane) conduct the negotiations on behalf of Sloane and report back to the others.

The negotiators obtained written financial information about Beck, including Beck's 1967 annual report, a projected balance sheet as of December 31, 1967, two financial analyses of Beck published by investment companies, and a 1968 proxy statement. Alleged misstatements in these documents are charged as fraud.

Early in December of 1968, the parties reached an agreement in principle, subject to the approval of the Sloane shareholders. The agreement provided for the exchange of all of the stock of Sloane for Beck common stock plus cash.

In early March of 1969, Manuel Rothberg learned that Beck planned to acquire a group of stores called Unimart. Rothberg telephoned McDevitt and told him that the principals of Sloane might stop negotiations in light of the Unimart purchase. McDevitt asked Rothberg and Bernard Greenberg go come to New York to discuss the effect of the Unimart acquisition.

On March 12, 1969, Rothberg and Greenberg met with McDevitt. McDevitt told them that Beck was planning to acquire the Unimart stores by having Beck's subsidiary corporations acquire the leasehold interests and fixtures of the stores. He said that Beck, the parent corporation, had committed only $400,000 of its own capital to the acquisition of the Unimart stores and only $2,700,000 in additional Beck capital would be required for inventory. McDevitt assured the Sloane group that Beck would not be liable for rent on the Unimart leases.

At the March 12 meeting, McDevitt also told Rothberg and Greenberg that Beck had recently completed a private placement of 250,000 shares of Beck common stock at more than $28⅞ per share. McDevitt said that he could not tell them the exact price because the transaction had not yet been reported to the SEC. This statement of the price is also alleged to have been fraudulent; plaintiffs contend the real price was $25 per share.

McDevitt assured Rothberg and Greenberg once again that Beck was in strong financial condition, it had enough working capital to handle the financing of its acquisition plans, and it had a management team capable of planning retail centers for the new acquisitions.

Beck's 1968 financial statement, certified by Ernst & Ernst, was issued in March of 1969. This statement is the foundation of one of the claims against the accounting firm.

In August and September of 1969, the parties restructured the merger agreement to provide for Sloane's acquisition by Beck in exchange for preferred stock in Beck. The preferred stock was to have a guaranteed redemption price after five years of $120 per share. The parties executed the final merger agreement on September 26, 1969.

The plaintiffs claim that they first became aware on June 16, 1970 that McDevitt might have misrepresented material facts during the 1969 merger negotiations. On that day, Rothberg read in *Home Furnishings Daily* that Food Giant was suing Beck over the Unimart leases, claiming that Beck was fully liable for them. On June 18, 1970, Bernard Greenberg met with a Los Angeles attorney to discuss rescission of the Sloane-Beck merger.

On July 11, 1970, Rothberg and Bernard Greenberg represented Sloane at a meeting with Beck management in New York. McDevitt announced at this meeting that Beck was considering bankruptcy.

The original complaint by nine shareholders was filed, as noted, on June 13, 1973,

within three years of the appearance of the story in *Home Furnishings Daily* that Beck was, if not in financial difficulty, at least being sued for rent. The amended complaints bringing in additional parties plaintiff were not filed until June 29, 1973, and service on various defendants was accomplished over a period of time thereafter. For the purposes of this case, however, we hold that the action was commenced on June 13, 1973. The claims of the plaintiffs who joined after the action was commenced are entitled to the relation-back principle of Fed.R.Civ.P. 15(c) and will be treated as having been filed with those of the original nine on June 13, 1973.

The California "discovery" test is stated in *Schaefer v. Berinstein*, 140 Cal. App.2d 278, 294–95, 295 P.2d 113, 124 (1956):

> "The statute commences to run only after one has notice of circumstances sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry. * * * Where there is a duty to investigate, the plaintiff may be charged with knowledge of the facts which would have been disclosed by an investigation; but where there is no prior duty to investigate, the statute does not run until he has notice or knowledge of facts sufficient to put a reasonable man on inquiry."

*See also Stevens v. Marco*, 147 Cal.App.2d 357, 381, 305 P.2d 669, 683–84 (1956); *Tognazzini v. Tognazzini*, 125 Cal.App.2d 679, 687, 271 P.2d 77, 82 (1954).[3]

"Discovery" occurs (1) when the plaintiff had actual knowledge of facts sufficient to arouse suspicion in a reasonably prudent person, or (2) when the plaintiff had access to the "means of knowledge" of such facts and a reasonably prudent person would have used those means before making the relevant financial decision. More-over, if a prudent person would have become suspicious from the knowledge obtained through the initial prudent inquiry and would have investigated further, a plaintiff will be deemed to have knowledge of facts which would have been disclosed in a more extensive investigation.

The trial judge concluded as a matter of law that the plaintiffs knew or should have known the falsity of McDevitt's misrepresentations before June 13, 1970. The several alleged misrepresentations will be discussed separately.

*Misrepresentation about the Unimart acquisition.*

The trial judge concluded that the plaintiffs had "discovered" the falsity of McDevitt's misrepresentations about the Unimart deal before June 13, 1970 because the "true" details of the deal were revealed in Beck's prospectuses of October and May, 1970 (which stated that Beck had the Unimart "leasehold interest"), and in the June 3, 1970 issue of a trade paper to which three of the plaintiffs subscribed.

The plaintiffs argue that the wording of the prospectuses did not reveal the falsity of the representations. They say that these documents were ambiguous in light of McDevitt's statement that Beck's subsidiary would acquire the leasehold interests. The validity of this argument depends on the technical accuracy a reasonably prudent person would expect of statements made in a corporate prospectus.

The plaintiffs assert that no plaintiff read the article in the trade paper until June 16, 1970. Knowledge of the paper's contents could not be conclusively imputed to the subscribers before the date they saw it unless a court can say as a matter of law that a reasonably prudent person will read all trade papers on the date they are re-

---

**3.** California law requires a plaintiff to allege and prove when the fraud was discovered. *Tognazzini v. Tognazzini*, 125 Cal.App.2d at 686–87, 271 P.2d at 81. However, in *Turner v. Lundquist*, 377 F.2d 44, 48 (9th Cir. 1967), this court held that federal procedure does not require a plaintiff to allege the time and circum-stances of discovery of fraud in his or her complaint. When the matter is raised on a motion for summary judgment, the plaintiff must disclose his or her evidence on the point in order to show that there is a genuine issue of fact to be tried.

ceived. This proposition does not commend itself to us as one that is, or will become, the law of California.

■ The judge also found that the plaintiffs should have questioned Sidney Moray, the head of the Unimart company, about the terms of that acquisition, because McDevitt suggested they do so. But the parties urged upon the court conflicting versions of McDevitt's advice to the plaintiffs about contacting Moray. Therefore, the issue whether a reasonably prudent person would have contacted Moray in the circumstances of this case is a factfinder's question. We believe it was error to decide it as a matter of law.

The appellees also seek to support the trial judge's decision on the Unimart merger by noting that the terms of the transaction were revealed in Beck's July 17, 1969 registration statement filed with the SEC. The appellees argue that a reasonably prudent person would have checked the SEC filings to verify the terms of the acquisition. The plaintiffs claimed that they had no knowledge of the filing. Defining reasonable conduct by the Sloane group on this point is also work for the trier of facts.

*Misrepresentations of Beck's financial condition.*

■ The trial judge's finding of "discovery" by the Sloane group was based in large part on his conclusion that some of the plaintiffs were aware prior to June 13, 1970 of a number of facts that indicated that Beck had not been in sound financial condition at the time of the merger, contrary to McDevitt's representations. The judge pointed to several documents received by the plaintiffs from October 1968 to late 1969 which showed Beck's shortage of capital and increasing debt. The plaintiffs argue that the information contained in these documents was not sufficient to make a reasonably prudent person suspect fraud. Once again, the definition of investor reasonableness here calls for a review of the documents in question by a trier of fact in light of all the evidence. A trial judge should not assign conclusive legal effect to

such documents at the summary-judgment stage when there can be a genuine difference of opinion as to their impact on a reasonable person.

■ The trial judge also based his ultimate conclusion on two specific facts admittedly known to the plaintiffs before June 13, 1970: Beck's failure to pay the plaintiffs the June 1, 1970 quarterly dividend on their preferred stock, and the substantial (eighty-five per cent) decline in the value of Beck's common stock.

The plaintiffs argue that a missed dividend indicated only that Beck was not in sound financial condition after the merger. In essence, they argue that a reasonably prudent person who became aware of Beck's financial problems after the merger would not necessarily have suspected fraud in the merger. Market evidence might point equally to a general decline in the economy or post-merger mismanagement as the cause of Beck's financial condition. This kind of analysis also indicates that the reasonableness issue was for the factfinder, rather than for the judge to decide as a question of law.

*Misrepresentations about the value of Beck's inventory.*

The trial judge did not discuss the plaintiffs' discovery of the misrepresentations of the value of Beck's inventory. These representations were made in the 1968 financial statement certified by Ernst & Ernst and orally vouched for by McDevitt. The appellees argue that the discovery of the falsity of some of the oral representations should have led the Sloane shareholders to doubt the truth of all representations by Beck. This argument would be appropriate for the factfinder to consider; but again, it is inappropriate for summary disposition.

■ The inventory misrepresentation was the only misrepresentation which appeared in written form. Beck warranted its written representations in the merger agreement, but did not warrant its oral representations. It is possible that a reasonably prudent person would not suspect

written representations to be false even after discovering the falsity of some oral representations. The part of the action based on allegations of written misrepresentations would not be barred by the statute of limitations until there was some discovery of the falsity of those representations. Here again, the time when a reasonable shareholder's representative would have been put upon inquiry about fraud was a question of fact to be tried upon all the evidence; the question did not lend itself to summary disposition.

*Misrepresentations about the private stock placement.*

██ The trial judge based his finding of discovery of this misrepresentation on the fact that the correct price per share appeared in several prospectuses received by some of the plaintiffs after the merger. The court noted that the plaintiffs were aware that the price would appear in Beck's February 1969 filing of Form 8–K with the SEC.

McDevitt allegedly made the misrepresentations as to price on March 15, 1969. Beck's 8–K form was filed soon after the March 12 meeting. The Beck-Sloane acquisition transaction was closed on September 26, 1969. The first Beck prospectus containing the true price of Beck's shares in the private stock placement was received by members of the Sloane management group in October of 1969. The plaintiffs argue that they are not bound by "discovery" in October of 1969, because by the time they read the prospectus, they had forgotten the price McDevitt had told them. But they cite no case in which a mere memory lapse on the part of the victim has precluded a finding of "discovery". The trial judge's ruling as to this misrepresentation was based on undisputed facts and therefore was appropriate for a decision as a matter of law.

Thus, at least one misrepresentation was known to the Sloane group, or should have been known to a member, as early as October 1969. The appellees argue that even if the trial judge took upon himself more fact-finding than was strictly appropriate, the plaintiffs are still barred. The appellees claim that the plaintiffs should have been on inquiry about all of the burgeoning signs of fraud as soon as they knew, or should have known, that Beck had given them false information on the value of the shares. The appellants meet this argument by saying, in effect, that one misstatement on the future value of stock is not itself a sure signal that fraud taints the entire negotiation.

Great as the burden may be upon a busy court, it is necessary to place before a fact-finder the conflicting recollections of facts and the conflicting inferences to be drawn from such facts in this case. The conflicting assertions in this case about what a reasonable investor would have known presented issues of the type usually reserved for juries. The trial court understandably sought to shorten the proceedings by summary judgment, but material questions of fact remained to be tried.

██ In view of the need for further proceedings, we notice another point briefed and argued upon appeal: the trial court's ruling that "discovery" of fraud by the six plaintiffs acting as the negotiating team amounted to discovery by all 45 plaintiffs for the purpose of barring their claims under the statute of limitations.

The plaintiffs argue that the six negotiators ceased to act as agents for the shareholders (if they ever were agents) after the closing of the merger. No party points to any evidence in the record about the relationship between the management group and the other shareholders after the merger to support either theory.

Rothberg and Bernard Greenberg denied that an agency relationship existed. It follows that a genuine issue of material fact remains as to the understanding between the shareholders and the six members of the negotiating team both before and after the merger. It is not clear that the evidence, when viewed in the light most favorable to the plaintiffs, shows an agency relationship as a matter of law. Therefore, on

remand the parties should address the relationship of the management group to the other shareholders.

We express no opinion on issues not decided in the district court. Because of the error in ruling as a matter of law that the alleged fraud was discovered before June 13, 1970, it is necessary to remand the case to the district court for further proceedings. If the parties cannot settle these questions, a trier of fact must decide when reasonable persons in the shareholders' positions would have been placed upon such inquiry as to have been brought within the California law on discovery of fraud for the purposes of the statute of limitations.

Upon another trial, the court should also address the question whether a pendent claim against Ernst & Ernst can be maintained under California negligence law, and if so, whether the alleged negligence, if any, is time barred by California statutes of limitations. Because none of these questions were presented on appeal, we express no opinion on them.

Reversed and remanded.